UNITED STATES of America, Plaintiff,

v.

Ira Russell ARNOLD, Johnny Mike Kulow, Defendants.

Crim. No. 87–1279–B.

United States District Court,
S.D. California.

Feb. 18, 1988.

Roger W. Haines, Jr., Asst. U.S. Atty., San Diego, Cal., Douglas Letter; Civ. Div., Dept. of Justice, Washington, D.C., for plaintiff.

John R. Steer, Gen. Counsel, U.S. Sentencing Com'n, Washington, D.C., amicus curiae.

Larry N. Ainbinder, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant Kulow.

Alan Morrison, Public Citizen Litigation Group, Washington, D.C., for defendants.

## ORDER GRANTING MOTION TO INVALIDATE GUIDELINES PROMULGATED BY THE UNITED STATES SENTENCING COMMISSION, AND RELATED ORDERS

BREWSTER, District Judge.

### I. BACKGROUND

Defendants move the court for an order declaring the sentencing guidelines ("Guidelines") promulgated by the United States Sentencing Commission ("Commission") pursuant to the Sentencing Reform Act of 1984 ("Act"), 28 U.S.C. §§ 991–98 (1987), invalid on the grounds that the Act violates the delegation doctrine and separation of powers. Defendants have pled not guilty to an indictment charging in five counts violations of 18 U.S.C. §§ 371, 1708 arising out of conduct which allegedly occurred after November 1, 1987.[1] The case is in pre-trial stage with a motion for discovery set for March 15, 1988. Detailed factual recitation of this case is not necessary since the motion does not depend on the alleged conduct of these defendants and will therefore be omitted here.

Preliminarily, the court is sensitive to the gravity of the task presented by this motion and approaches the issues with great deference to the dedication of hundreds of persons and thousands of hours, plus the expenditure of millions of dollars which have been committed to producing both the Act and the initial Guidelines. As the Supreme Court commented regarding its duty of statutory review:

> Although research has shown and practice has established the futility of the charge that it was a usurpation when this Court undertook to declare an Act of Congress unconstitutional, I suppose that we all agree that to do so is the greatest and most delicate duty that this Court is called upon to perform.

*Blodgett v. Holden,* 275 U.S. 142, 147–48, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1928).

Nevertheless, the parties are entitled to the court's response to the motion in accordance with the court's solemn duty.

> When an act of Congress is appropriately challenged in the courts as not conforming to the constitutional mandate the judicial branch of the Government has only one duty,—to lay the article of the Constitution which is involved beside the statute which is challenged and to decide whether the latter squares with the former.

*United States v. Butler,* 297 U.S. 1, 62, 56 S.Ct. 312, 318, 80 L.Ed. 477 (1936).

The court is also aware of the admonition that a statute must be construed, whenever possible, to save it from unconstitutionality. *Driscoll v. Edison Light & P. Co.,* 307 U.S. 104, 114–15, 59 S.Ct. 715, 720–21, 83 L.Ed. 1134 (1939).

It is with these principles in mind that the court reviews the constitutionality of the Guidelines.

### II. CONCLUSIONS

The court, having reviewed briefs by defendants, the Government, and the *Amicus* brief of the Commission, and having heard oral presentations by counsel for all the same, and otherwise having studied the matter, concludes for the reasons which will be stated in more detail below, as follows:

---

**1.** Effective date of the jurisdiction of the Guidelines. Sentencing Act of 1987, 101 Stat. 1266 (1987).

1) The issues raised by the motion are "ripe" for determination now;

2) The Guidelines of the Commission to date are invalid because they are the product of a Commission whose placement in the Judicial Branch and whose composition, so far as it mandatorily includes article III judges as members, violate the constitutional doctrine of separation of powers.

## III. STATUTORY FRAMEWORK

The Sentencing Reform Act of 1984 effects a major revision of sentencing in the federal courts, both procedurally and substantively. By this legislation, Congress created the Commission in the Judicial Branch of the United States to establish sentencing policy and practices for the federal criminal justice system within extensive criteria as outlined by Congress in this and other statutes.[2]

The members of the Commission, consisting initially of seven voting and two *ex officio* non-voting members, were appointed by the President by and with the advice and consent of the Senate for six-year terms, renewable once. 28 U.S.C. § 991(a). They are removable by the President only for "neglect of duty or malfeasance in office or for other good cause shown." *Id.* At least three voting members must be article III judges, selected from a list of six judges recommended to the President by the Judicial Conference of the United States. *Id.* At the present time, three circuit judges serve on the Commission.[3]

Within the specified philosophical parameters set by Congress, the Commissioners' duties include the promulgation and distribution to all courts of the United States and to the United States Probation System of the following:

1) sentencing guidelines for use of sentencing courts for most federal crimes;

2) general policy statements explaining application of the guidelines or any other aspect of sentencing or sentencing imple-

mentation in furtherance of Congressional purposes established by statutes, including, but not limited to the following:[4]

a) sanctions;

b) conditions of probation and supervised release;

c) sentence modifications;

d) imposition of fines;

e) plea agreement authorities and implementations;

f) temporary release provisions and pre-release custody;

g) guidelines for revocation of probation;

3) reports of compliance by sentencing courts obtained by monitoring procedures;

4) consideration of petitions of defendants requesting modification of guidelines utilized in sentencing that defendant;

5) research and development for future amendments and improvements to the sentencing mission; and

6) periodic training programs for all involved persons.

The Commission acts by an affirmative vote of at least four voting members to establish all general policies, rules and regulations for Commission functions. § 994(a). The Commissioners serve full time for the first six years after the Guidelines go into effect; thereafter, the voting members, other than the Chairman, serve part time as necessary to perform the duties and powers outlined in the Act. § 922(c).

## IV. ISSUES AND DISCUSSION

### A. *Ripeness*

Although no party raises the issue, a threshold question for the court's determination is whether the motion is ripe for decision. In an oft-quoted passage in the declaratory judgment context, the Supreme Court has admonished that "[t]he disagreement must not be nebulous or contingent

---

2. 18 U.S.C. §§ 3551–59, 3561–66, 3571–74, 3581–86.

3. Judge William W. Wilkins, Jr., Chairman (4th Circuit), Judge Stephen G. Breyer (1st Circuit),

and Senior Judge George E. MacKinnon (D.C. Circuit).

4. *See supra,* note 3.

but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952).

Although the concept of ripeness lacks precise formulation and consistent application, the usual analysis balances two broad factors—the "fitness of the issues for judicial decision" against "the hardship to the parties of withholding court consideration." *Abott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

■ A central component of the fitness for review factor is whether the motion involves uncertain or contingent future events that may never occur. *Thomas v. Union Carbide Agricultural Products*, 473 U.S. 568, 580, 105 S.Ct. 3325, 3332–33, 87 L.Ed.2d 409 (1985). If such be the case, the court could find itself engaged in unnecessary lawmaking. *See* 13A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3532.1, at 114–15 (1984). The Guidelines may never be invoked in this case. The defendants may decide not to enter guilty pleas and could be acquitted at trial. The court's inquiry, however, should look beyond the two defendants presently before the court. Nationally, defendants are entering guilty pleas for conduct occurring after November 1, 1987. The Guidelines, therefore, are mathematically certain to be immediately applicable in a finite number of cases, if not in this case.

■ Another consideration in weighing the fitness for review focuses on the nature of the issues before the court. Issues which are purely legal, requiring no further factual development to clarify the dispute, support fitness for judicial action. *Thomas*, 473 U.S. at 581, 105 S.Ct. at 3333; *Piledrivers' Local 2375 v. Smith*, 695 F.2d 390 (9th Cir.1982); *Arizona v. Atchison, T. & S.F.R.R.*, 656 F.2d 398, 402–03 (9th Cir. 1981). The issues now before this court are purely legal and need no further factual development. This first part of the so-

called "balancing test" supports the conclusion that this case is fit for review.

■ As for the balancing factor to be weighed, i.e., the hardship on the parties of withholding review, the needs of the parties for a determination are substantial, if not massive. Hundreds of cases are being filed nationally each week, pleas are being analyzed and negotiated, extensive effort is being expended by the Commission, and a myriad of arrangements are being made for putting into place institutions to monitor, oversee, review, and administrate the Act and its execution. The longer the constitutionality of the Guidelines and the Commission remain uncertain, the deeper the system will be impacted. Furthermore, defendants presently need to decide whether to tender a guilty plea or to risk trial. They would be assisted in making an informed decision by knowing more about their prospective sentence than what the statutory maximum is for each count. In this case, as in *Thomas*, "[n]othing would be gained by postponing a decision, and the public interest would be well served by a prompt resolution of the constitutionality of [the challenged statute]." *Thomas*, 473 U.S. at 582, 105 S.Ct. at 3333. Accordingly, this court finds this case ripe for its ruling on the motion presented.

### B. *Delegation Doctrine*

Defendants challenge the Act as an unconstitutional delegation of legislative power in violation of article I of the Constitution. Article I provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States...." U.S. Const., art. I, § 1. The delegation doctrine thus prohibits the legislature from delegating its legislative power to another branch of the government.

In exercising its legislative power, however, Congress may draw assistance from the other branches of the government. Indeed, "[i]n an increasingly complex society Congress obviously could not perform its functions if it were obligated to find all the facts subsidiary to the basic conclusions which support the defined legislative poli-

cy." *Opp Cotton Mills, Inc. v. Administrator,* 312 U.S. 126, 145, 61 S.Ct. 524, 532, 85 L.Ed. 624 (1941). When Congress sought to regulate utilities, for example, it was permitted to delegate to the Federal Power Commission the authority to set "just and reasonable" rates for natural gas. *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 600, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise their delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928).

Defendants argue that Congress failed to provide sufficient guidance to direct the Commission's implementation of the Act. This court views defendants' delegation challenge in the context of the history of the delegation doctrine.

Only twice has the Supreme Court struck down a statute by reason of undue delegation of legislative power. For an historical summary, see *Synar v. United States,* 626 F.Supp. 1374, 1383 (D.D.C.), *aff'd on other grounds sub nom., Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). Both cases were decided during a period of unusual conflict between the Court and the Roosevelt-dominated Congress. Both cases struck down portions of the National Industrial Recovery Act of 1933. *See A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Since then, the Court has not invalidated a statute under the delegation doctrine. *Synar,* 626 F.Supp. at 1383 & n. 9. This unswerving rejection of delegation challenges indicates a great deal of deference to Congress' power to delegate. *Id.* at 1384.

In view of this historical deference, the district court should not expand the delegation doctrine beyond the scope of *Schechter Poultry* or *Panama Refining.* Moreover,

the Supreme Court usually analyzes challenges under the delegation doctrine by comparing delegations previously adjudicated. *Synar,* 626 F.Supp. at 1384–85. Thus, the facts of *Schechter Poultry* and *Panama Refining* provide a useful starting point for the analysis.

*Schechter Poultry* concerned a statute that permitted members of an industry to propose, and the President to approve, "codes of fair competition" for that industry. Congress neglected to define "fair competition" in any way, leaving it to industry and the President to codify any measures that "may tend to effectuate" such broad goals as increased industrial utilization, increased consumption, reduced unemployment, improved standards of labor, and conservation of natural resources. *Schechter,* 295 U.S. at 534–35, 55 S.Ct. at 845. Indeed, the purposes of the statute resemble an economist's formulation for an utopian society. The Court understandably held that the statute's "wish list" of permissible goals did not provide adequate standards to guide industry or the President. *Id.* at 541–42, 55 S.Ct. at 848.

*Panama Refining* also dealt with a delegation challenge to the National Industrial Recovery Act. The section there under attack authorized the President to make illegal any shipments of petroleum or petroleum products produced or withdrawn from storage in excess of the amount permitted by state authority. *Panama Refining,* 293 U.S. at 414–15, 55 S.Ct. at 245–46. The statute failed to set forth any policy or rules to guide state officials in their determinations of what production should be permitted. Nor did the statute establish any criteria to govern the President's discretion. *Id.* at 415, 55 S.Ct. at 246. The Court struck down that section of the National Industrial Recovery Act because "it gives to the President an unlimited authority to determine the policy and to lay down the prohibition, or not lay it down, as he may see fit." *Id.*

The contrast between these cases and the Sentencing Act is manifest. The Act does not increase the existing delegation of sentencing authority. Before the Act, the

courts were constrained to sentence within the maximum and minimum, if any, set out in each criminal statute. The Act does not permit the Commission to ignore these existing sentencing limits or authorize any punishment that was not possible before the Act. *Compare United States v. Robel,* 389 U.S. 258, 273–75, 88 S.Ct. 419, 428–30, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring). This aspect alone distinguishes the Act from the broad conferrals of lawmaking power struck down in *Schechter Poultry,* and *Panama Refining.*

Within these limits, the Act also provides clear policy statements and specific directives to guide the Commission in exercising the delegated rulemaking authority. The Act sets forth the following "intelligible principles" to orient the Commission: (1) punish in accordance with the four recognized purposes of criminal law—punishment, deterrence, protection, and rehabilitation; (2) eliminate sentencing disparities as between similarly situated defendants; and (3) maintain sufficient flexibility to accommodate mitigating or aggravating circumstances in individual cases. 28 U.S.C. § 991(b)(1).

The remainder of the Act, in large part, contains specific rules to narrow and define the parameters of the Commission's task. The Act directs the Commission to use a two-dimensional matrix for different categories of offenses versus different categories of defendants. *See* § 994(c), (d). Congress further channeled the Commission's efforts by suggesting the factors to be considered in categorizing different offenses and different defendants. *Id.* The Act requires the Commission to create neutral guidelines with respect to race, sex, national origin, creed, and socio-economic status. § 994(d). The Act also orders the Commission to preclude from sentencing evaluation the defendant's education, vocational skills, employment record, community ties, and family ties and responsibilities. § 994(e).

The list goes on. The Act directs the Commission to structure the Guidelines to minimize prison overcrowding. § 994(g). The Commission is instructed to use cur-

rent average sentences for the starting point of its considerations. § 994(m). The Guidelines were to reflect congressional favor for those defendants who substantially assist a criminal investigation. § 994(n).

In addition to this abundance of legislative instruction, Congress expressed specific sentencing preferences for certain categories of offenses and defendants. Congress deemed the maximum terms of imprisonment to be justified where the offense was a crime of violence or was one of several drug-related crimes, and the offender had been previously convicted of two or more similar felonies. § 994(h). Congress deemed a "substantial term of imprisonment" necessary where the defendant is a repeat offender or career criminal, the defendant acted in a managerial capacity in furtherance of a conspiracy, the defendant committed a felonious crime of violence while on temporary release from custody, or the defendant committed one of several drug offenses involving substantial quantities( of contraband. § 994(i).

In addition to these specific examples, Congress gave the Commission a sliding scale of culpability with which to work. At one end are first offenders who have not committed a crime of violence or an otherwise serious offense. These defendants should not receive prison sentences. § 994(j). At the other end of the scale, persons convicted of crimes of violence that result in serious bodily injury should receive prison terms. *Id.*

■ Defendants point out several areas where Congress could have given more guidance to the Commission than it did. That is not the test, however. "It is not necessary that Congress supply a specific formula in a field where flexibility and adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *Lichter v. United States,* 334 U.S. 742, 785–86, 68 S.Ct. 1294, 1316–17, 92 L.Ed. 1694 (1948). The Act provides ample statements of policy and specific rules to guide the Commission's exercise of the delegated authority. The court holds, therefore, that the Act

does not constitute an invalid delegation of legislative power.

## C. *Separation of Powers*

The separation of powers doctrine lies at the heart of our constitutional structure of government. In establishing the three branches of government, the Legislative, the Executive, and the Judicial, the Framers conferred separate and distinct powers on each, together with correlative checks and balances, as a safeguard against the encroachment or aggrandizement of one branch at the expense of another. *Immigation and Naturalization Service v. Chadha,* 462 U.S. 919, 960, 103 S.Ct. 2764, 2788, 77 L.Ed.2d 317 (1983) (Powell, J., concurring).

Defendants contend the Commission as established and constituted offends the doctrine of separation of powers in the following respects: (1) it unconstitutionally locates the Commission in the Judicial Branch; (2) it unconstitutionally mandates the service of at least three article III judges; and (3) it unconstitutionally vests removal power in the President.[5]

██ The first objection is well taken. The court agrees with the defendants and the Government that the Act impermissibly designates the Commission as a part of the Judicial Branch. Section 991(a) of the Act provides: "[t]here is established as an independent commission in the Judicial Branch of the United States a United States Commission...." Notwithstanding the designation and placement of Congress, the Commission functions in a nonjudicial capacity.

Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies. U.S. Const., art. III, § 2, cl. 1. The Judicial Branch includes the federal courts that exercise this power, as well as certain judicial adjuncts employed under the direct supervision of the courts. *See United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). By contrast, the Commission decides no cases or controversies,[6] does not aid in the administration of the court system,[7] and its members are appointed by the President without the constitutionally required safeguards of life tenure and salary protection.

The Commission is primarily charged with promulgating rules and policy statements interpreting and elaborating on standards enunciated by Congress.[8] As such, the Commission's duties and powers are distinctly nonjudicial in nature. In fact, the Act appears to contemplate a Commission which possesses powers and duties inherently executive in nature. In *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), the Supreme Court discussed the character of the different branches of government stating: "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." Accordingly, the functions of the Commission—interpreting, monitoring, and enforcing the mandate of the statute as laid out by Congress—appear to fall within the construction of what constitutes an executive function. Furthermore, this court is unable to find any other agency, commission, or

---

5. Because the court concludes that the Commission, as statutorily designated and composed, may not exercise the powers conferred upon it by the Act, it has no occasion for considering defendants' other challenges to the act, including their argument that the removal power of the President violates the doctrine of separation of powers.

6. The only arguably quasi-adjudicative function performed by the Commission is the review of petitions for modification of the guidelines by defendants as set forth in 28 U.S.C. § 994(s).

7. The Commission's powers and duties differ substantially from other nonadjudicating judicial bodies such as the Judicial Councils, 28 U.S.C. § 332, the Judicial Conference, 28 U.S.C. § 331, and the Administrative Office, 28 U.S.C. § 601, which perform the necessary chore of administering the court system.

8. In establishing guidelines for use by sentencing courts, the Commission promulgates rules similar to those of other executive agencies such as the Occupational Safety and Health Administration, the Federal Trade Commission, and the Securities and Exchange Commission.

council so empowered in the Judicial Branch.[9]

Having found the Commission to be, in actuality, performing primarily executive duties and powers, its location in the Judicial Branch offends U.S. Const., art. III, § 2, cl. 1. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792); *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1852). As James Madison admonished: "[w]ere the power of judging joined with the Legislative, the life and liberty of the subject would be exposed to arbitrary controul, for *the judge* would then be *the Legislator*. Were it joined to executive power, *the judge* might behave with all the violence of an *oppressor*." *The Federalist No. 47* at 303 (Rositer ed. 1961) (emphasis in original).

The government suggests that the court should sever the designating language from the Act rather than declare the Commission unconstitutional. In these circumstances, the court deems such judicial conduct inappropriate and unnecessary. In some cases, statutory language otherwise unconstitutional is properly severable from the statute as a whole. *Alaska Airlines, Inc. v. Brock*, — U.S. —, 107 S.Ct. 1476, 1480–81, 94 L.Ed.2d 661 (1987). However, in this case, striking the designating language and effectuating a *de facto* transfer of the Commission from the Judicial Branch to a different branch or to an independent status would appear to unduly frustrate Congressional intent.[10]

This court leaves to Congress the task of amending the Act, if it so chooses, to locate the Commission where it will, so long as it observes constitutional separation of powers constraints.

■ Furthermore, even if the court severed the designating language, the Act would still unconstitutionally violate the doctrine of separation of powers because of the composition of the Commission. By mandating the inclusion of at least three article III judges, the Act unconstitutionally impairs, both quantitatively and qualitatively, the functions of the individual judge-Commissioners and the Judicial Branch as a whole.

The doctrine of separation of powers does not require the three departments of government to remain "hermetically sealed" from one another. *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). Rather, the Constitution envisions the three branches functioning independently within their separate areas, but cooperatively in their relations with each other. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

The proper test for gauging the constitutionally permissible level of interdependence or interaction among the branches "focuses on the extent to which [the challenged statute] prevents the [particular] Branch from accomplishing its constitutionally assigned functions." *Nixon v. Administrator of General Services*, 433 U.S. at 443, 97 S.Ct. at 2790 (citing *U.S. v. Nixon*, 418 U.S. 683, 711–12, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974)). If it does, a further inquiry must be made as to whether that impact is justified by an overriding need to promote objectives within the constitutional authority of the acting branch. *Id.* at 425, 97 S.Ct. at 2777.

The quantitative impairment of the judge-Commissioners is evident and needs little explanation. The judge-Commissioners are required to serve in a nonjudicial capacity on a full-time basis for at least six years.[11] Thus, article III judges undertake

---

**9.** The Parole Commission which performs a similar role of rulemaking, policy interpretation, and administrative oversight is located in the Executive Branch. 18 U.S.C. § 4202 (1982).

**10.** The Senate Report on the legislation establishing the Commission states an intent to place the Commission in the Judicial Branch. The report notes "the Committee's *strong* feeling that, even under the legislation, sentencing

should remain primarily a judicial function." S.Rep. No. 98–225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.Code Cong. & Ad. News 3182, 3342.

**11.** 28 U.S.C. § 992 provides for a six-year term except that the initial terms of the first Commission are staggered so that some judge-Commissioners will serve less than a full six-year initial term.

a full-time nonjudicial appointment which substantially, if not totally, impairs their ability to perform their article III duties. It is speculative to predict the individual impact thereafter, which by statute contemplates a part-time commitment as necessary to perform commission tasks. However, the court need not query about the future effect since an actual individual functional impairment exists presently.

The quantitative impairment of the Judicial Branch is also clear, although in magnitude it is less damaging. The Act requires the appointment of at least three judges, but it does not provide for their replacement on the courts from which they are drawn. Furthermore, given the major roles that all judge-Commissioners have in the development of the Guidelines, they must inevitably recuse themselves from consideration of all future criminal cases involving sentencing issues. Presumptively, the absence of these judge-Commissioners results in an increase in the adjudicative workload of the remaining judges.[12] Although the court recognizes this problem, it is unable to conclude that this problem alone constitutes such a substantial impairment as to create a violation of the principle of separation of powers.

The gravamen of the functional impairment problem stems from the qualitative impairment of the judge-Commissioners and the Judicial Branch. For federal judges to perform properly their judicial function, they must remain impartial and independent. The observation that "[i]mpartiality is one of the central, constitutionally ordained requirements of federal judicial office," *In re Application of the President's Commission on Organized Crime Subpoena of Scaduto*, 763 F.2d 1191, 1197 (11th Cir.1985), is supported by both the Framers' intent[13] and subsequent Supreme Court cases.[14]

The independence and impartiality of the federal judicial office is threatened by the mandatory participation of three article III judges on the Commission. The act *mandates* article III judges to serve full-time on a permanent commission charged with policy-making, rule-making, supervisory, enforcement, and oversight responsibility respecting sentencing of defendants. The judges are mandated to serve presumably because as judges they bring a resource of experience and expertise to the Commission. However, in such service they participate in promulgating substantive rules, and they face the threat of Presidential removal as Commissioners.

There are serious questions as to whether a judge-Commissioner can maintain objectivity in carrying out the judge's courtroom duties. In *Scaduto*, the Eleventh Circuit held that the merely advisory service of article III judges on the President's Commission on Organized Crime threatened the impartiality of the individual judge-Commissioners. The court stated:

[a] judge who is charged with assisting and improving enforcement efforts against organized crime must adopt a pro-government perspective which is ill-suited to his obligation to be neutral in the courtroom. The kind of information he might uncover through the investigatory activities of the Commission would further endanger his impartiality.

763 F.2d at 1197. The same dangers of loss of impartiality are present in this case. The judge-Commissioners must now wear two hats—one Executive and one Judicial. They sit with members of the Executive Branch, including the Attorney General, and are subject to removal by the President. Yet, they must also maintain their complete independence and impartiality in their role as article III judges.[15]

12. Defendants' Supplemental Points and Authorities at Exhibit 1 (letter from Chief Justice Burger to President Reagan (December 13, 1984)).

13. *See The Federalist No. 78* at 469 (Rositer ed. 1961); *The Federalist No. 39* at 245–46 (Rositer ed. 1961).

14. *See United States v. Will*, 449 U.S. 200, 218, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980).

15. Unlike the situation in *Scaduto* where service by article III judges was not mandatory, the individual judge-Commissioners serve on the Commission in their role as article III judges. *See Scarfo*, 783 F.2d at 376 n. 3, where the court distinguished voluntary service by judges on the President's Commission on Organized Crime from the congressionally mandated service by judges on the Sentencing Commission.

However, even if the court determined that the judge-Commissioners' neutrality were not impaired, it is clear that the Judicial Branch is qualitatively impacted. The Act creates a permanent working relationship between the Judiciary and the Executive on matters affecting criminal law. This is not a case where the appointment of the judge-Commissioners can be construed as a conferral of power on the judges personally as Commissioners.[16] Rather, Congress "assigned" to the Judicial Branch functions of a nonjudicial character which it required it to accept.

In making such a mandatory assignment, Congress has threatened the very essence of the Judicial Branch—its actual and apparent impartiality and independence. The Judicial Conference is required to prepare a list of six potential judge-Commissioners for the President, from which the President selects at least three Commissioners. 28 U.S.C. § 991(a). Thus, Congress has involved the Judicial Branch in the selection of members to an ongoing executive commission. This assignment creates, in effect and appearance, an excessive intermingling of two branches of government. Furthermore, the service of the judge-Commissioners on an executive commission erodes the appearance of impartiality of the Judicial Branch. In appeals certain to come, the courts will be called upon to adjudicate disputes challenging various aspects of the work of the Commission. In ruling on the merits of these challenges, judges may be reluctant to set aside the work of their judicial colleagues. Even if no such problem actually occurs, the perception of non-impartiality by litigants and the public at large is sufficient to constitute a violation of the principle of separation of powers.

The parties can demonstrate no overriding need justifying inclusion of article III judges on the Commission. Congress could have selected a variety of options to achieve sentencing reform without requiring judicial service on the Commission. Judges could have been invited to consult with the Commission, or to advise it. Such assistance was and is available without resorting to the mandatory appointment of judges as voting members of the Commission.

The court concludes that the Commission's makeup violates the doctrine of separation of powers to the extent it includes article III judges as members.

## V. SEVERABILITY OF THE COMMISSION'S WORK PRODUCT

Having concluded that the inclusion of article III judges on the Commission is unconstitutional, the court must now determine whether or not past actions by the Commission, including the promulgation of the Guidelines, are valid. The inquiry by the Court is whether, if the judge-Commissioners be deemed deleted from the remainder of the Commission, the past acts of the Commission are valid. *See Scaduto,* 763 F.2d at 1201–02.

In this case, it is impossible to exclude from prior actions of the Commission the influence of the three judge-Commissioners.[17] The Guidelines being promulgated and distributed by a constitutionally flawed commission must be held invalid.

## ORDER

Now, therefore, it is hereby ordered as follows:

**16.** Thus, the court distinguishes this case from that present in *In re Application of the President's Commission on Organized Crime, Subpoena of Scarfo,* 783 F.2d 370 (3rd Cir.1986) and *Scaduto,* 763 F.2d at 1191. In the present case, the mandatory appointment of judge-Commissioners implicates the Judicial Branch, in addition to impairing the functioning of the judge-Commissioners individually.

**17.** Even if the three votes of the judge-Commissioners approving the initial April, 1987 Guidelines were stricken, the Guidelines would not

have been properly approved. The Commission vote to approve the Guidelines was six in favor and one opposed. The opposition vote was cast by a nonjudge-Commissioner, Paul H. Robinson. United States Sentencing Commission, 52 Fed.Reg. 18,046 (1987). Since 28 U.S.C. § 994(a) requires an affirmative vote of at least four Commissioners, the striking of the judge-Commissioners' votes would result in three affirmative votes in favor of the Guidelines; such an affirmative vote is not sufficient under the Act to constitute proper Commission approval.

1) The Guidelines of the Commission to date are declared invalid in this case;

2) The defendants will be sentenced, if necessary, in all respects in accordance with the law applicable as though their alleged conduct had occurred prior to November 1, 1987.

3) It is further ordered that this decision and order is certified for immediate interlocutory writ or appeal as appropriate and if available under federal appellate procedures.