UNITED STATES of America

v.

Augusto VELEZ–NARANJO.

UNITED STATES of America

v.

Douglas VILLALBA.

Crim. Nos. H–88–2(AHN), H–88–5(AHN).

United States District Court,
D. Connecticut.

May 24, 1988.

Thomas G. Dennis, Federal Public Defender, Hartford, Conn., for defendant Velez Naranjo.

Thomas G. Dennis, Federal Public Defender, Hartford, Conn., for defendant Villalba.

## RULING ON DEFENDANTS' MOTIONS CHALLENGING THE CONSTITUTIONALITY OF THE FEDERAL SENTENCING GUIDELINES

NEVAS, District Judge.

Pending are motions from the defendants in the above-captioned cases to preclude application of the sentencing guidelines promulgated by the United States Sentencing Commission ("Commission") pursuant to the Sentencing Reform Act of 1984 ("Act"), 28 U.S.C. Sections 991–998. The defendants assert that the Act and guidelines are unconstitutional because: (1) the Commission's composition and functions violate the separation of powers doctrine; (2) Congress impermissibly delegated its powers to the Commission; and (3) the guidelines offend due process by unduly restricting the availability of probation as a sentencing option. The court is persuaded that the guidelines and underlying legislation are constitutionally infirm because they violate separation of powers principles. Accordingly, the defendants' motions are granted.

### Discussion

In light of the many decisions [1] preceding this court's opinion, the court dispenses

---

1. Since the February 18, 1988 release of *United States v. Arnold,* 678 F.Supp. 1463 (S.D.Cal. 1988)—the first district court ruling addressing the constitutionality of the Act—approximately 94 district judges have ruled on this issue, with 54 judges striking down the guidelines and 40

with a summary of the background of the Act, referring the reader instead to *United States v. Arnold,* 678 F.Supp. 1463, 1465 (S.D.Cal.1988) and *United States v. Estrada,* 680 F.Supp. 1312, 1315–17 (D.Minn. 1988), for cogent statements on the Act's statutory framework.

## I. *Ripeness*

■ Augusto Velez–Naranjo has been charged with violations of federal narcotics laws, Douglas Villalba with bank robbery. Their alleged offenses occurred after November 1, 1987, the effective date of the Act. Both defendants pleaded not guilty to the respective charges, and both have suppression motions pending before the court. Though the issue is not raised by the parties, the court must decide whether the defendants' challenges to the Act are ripe given the present posture of their cases.

A ripeness inquiry requires that a court balance the "fitness of the issues for judicial decision" against "the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Under the "fitness" prong, a court must consider whether "the motion involves uncertain or contingent future events that may never occur." *Arnold,* 678 F.Supp. at 1466 (citing *Thomas v. Union Carbide Agricultural Products,* 473 U.S. 568, 580, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985)). Because of the pretrial status of the defendants' cases, the contingency exists that both defendants may be acquitted at trial, thus obviating the need for application of the sentencing guidelines. Though there is no more than a probability that the guidelines will impact these defendants, it is "mathematically certain" that they will soon affect defendants in other cases. *Arnold,* 678 F.Supp. at

1466. Moreover, the issues raised in the pending motions are purely legal in nature —needing no further factual explication— and thus susceptible to judicial resolution. *Id.* (citing, among others, *Thomas,* 473 U.S. at 581, 105 S.Ct. at 3333).

On the "hardship" side of the *Abbott* equation, the court finds that both the defendants and the government would be unnecessarily burdened by postponement of a decision on the constitutional challenge to the Act. As the *Arnold* court succinctly reasoned,

> Hundreds of cases are being filed nationally each week, pleas are being analyzed and negotiated, extensive effort is being expended by the Commission, and a myriad of arrangements are being made for putting into place institutions to monitor, oversee, review, and administrate the Act and its execution. The longer the constitutionality of the Guidelines and the Commission remain [sic; remains] uncertain, the deeper the system will be impacted. Furthermore, defendants presently need to decide whether to tender a guilty plea or to risk trial. They would be assisted in making an informed decision by knowing more about their prospective sentence than what the statutory maximum is for each count.

678 F.Supp. at 1466.

Accordingly, the court concludes that the defendants' motions are ripe for judicial determination.

## II. *Separation of Powers*

The separation of powers doctrine is a core principle in the tripartite design of our government. "The Framers perceived that '[t]he accumulation of all powers legislative, executive, and judiciary in the same hands, whether of one, or few or many, and

---

upholding them. *Federal Judges Strike Down Sentencing Rules,* 14 Conn.L.Trib. 20, May 16, 1988, at 10. Often reaching widely varying interpretations, this plethora of rulings has purportedly created a "patchwork of sentencing practices" in the trial courts. *Disparity in Sentencing Is Back,* The Nat'l L.J., May 9, 1988, at 3. Some lower court decisions are now receiving appellate scrutiny at the circuit level; it appears predestined, however, that the final arbiter of

the Act's constitutionality will be the Supreme Court. As Judge Cabranes of this district recently noted in his ruling on this question, "it is not one on which an individual judge—or, perhaps, even a single court of appeals—can hope to have any substantial impact. Quite clearly, the faster the question is presented to the appellate courts, and especially to the Supreme Court, the better for all concerned." *United States v. DiBiase,* 687 F.Supp. 38, 42 (D.Conn.1988).

whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny.' " *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 960, 103 S.Ct. 2764, 2789, 77 L.Ed. 2d 317 (1983) (Powell, J., concurring in the judgment) (quoting *The Federalist* No. 47, p. 324 (J. Cooke ed. 1961) (J. Madison)). Only by diffusing govermental authority among the three branches could the Framers safeguard against the concentration of abusive power in one or two of the coordinate components. Though the Constitution allocates separate authority to each of the branches, the boundaries among the branches were intentionally imprecisely drawn: "That this system of division and separation of powers produces conflicts, confusion, and discordance at times is inherent, but it was deliberately so structured to assure full, vigorous and open debate on the great issues affecting the people and to provide avenues for the operation of checks on the exercise of governmental power." *Bowsher v. Synar,* 478 U.S. 714, 722, 106 S.Ct. 3181, 3187, 92 L.Ed. 2d 583 (1986).

■ Though each branch need not be isolated from its co-equals, *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977), the Court has not been hesitant to enforce the separation of powers doctrine "where one branch has impaired or sought to assume a power central to another branch ...." *Chadha,* 462 U.S. at 962, 103 S.Ct. at 2790 (Powell, J., concurring in the judgment). Functionally, separation of powers transgressions occur in either of two ways. A violation results when one branch assumes a function more properly allocated to another, *see Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 587–89, 72 S.Ct. 863, 866–67, 96 L.Ed. 1153 (1952), or when one branch unduly impairs the performance of another branch's constitutionally-designated function. *See Administrator of General Services,* 433 U.S. at 443, 97 S.Ct. at 2790; *United States v. Nixon,* 418 U.S. 683, 711–12, 94 S.Ct. 3090, 3109–10, 41 L.Ed.2d 1039 (1974). Before scrutinizing the placement and composition of the Commission under these dual lenses,

the court must ascertain whether the Commission's nature and function are inherently executive, legislative, or judicial.

■ 28 U.S.C. Section 991(a) provides in part: "There is established as an independent commission in the judicial branch ... a United States Sentencing Commission ...." According to the defendants, the Commission functions in a non-Article III capacity, notwithstanding the statutory judicial label, because it resolves no "cases or controversies." Though due some deference, Congress' characterization of the Commission does not bind this court. The Commission possesses significant rulemaking authority of a substantive nature. In promulgating 'guidelines' to be applied by a sentencing court when calculating sentences to be imposed on defendants, the Commission has been authorized to establish mandatory sentencing ranges for categories of offenses and defendants. 28 U.S. C. Section 994(b)(1). In creating these ranges, which place rigid restrictions on the discretion of a sentencing judge, the Commission interpreted and elaborated on detailed standards set forth by Congress in the Act: Congress formulated the intricate framework, the Commission filled in the interstices. In addition to drafting guidelines, the Commission is also empowered to promulgate policy statements regarding application of the guidelines. *Id.* Section 994(a)(2). The Commission's power and duties seem "distinctly nonjudicial in nature," *Arnold,* 678 F.Supp. at 1469, and are more akin to those possessed and exercised by executive agencies. As the *Bowsher* Court observed, "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." 478 U.S. at 733, 106 S.Ct. at 3192. The court finds that the Commission is, in reality, primarily imbued with executive rather than judicial powers and that when it acts, it does so in an executive capacity. *See, e.g., United States v. DiBiase,* 687 F.Supp. 38, 43 (D.Conn.1988) (Cabranes, J.); *United States v. Russell,* 685 F.Supp. 1245 (N.D.Ga.1988); *United States v. Frank,* 682 F.Supp. 815 (W.D.Pa.1988); *Arnold,* 678 F.Supp. at 1469–70 (Commis-

sion exercises executive, not judicial, authority). *But see Estrada,* 680 F.Supp. at 1318–21 (Commission impermissibly exercises substantive legislative power).

Having determined that the Commission exercises executive power, its placement in the judicial branch—in effect, the commingling of the prosecutor and the judge—offends Article III of the Constitution. As noted above, the "expansion of powers" principle under the separation of powers doctrine precludes one branch from exercising powers delegated to another branch. Congress' placement of the Commission in the judicial branch unconstitutionally expands the power of the judicial branch because the Act impermissibly requires that Article III judges perform extra-judicial government service as members of an executive body. "[E]xecutive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution." *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976) (citing *United States v. Ferreira,* 54 U.S. (13 How.) 40, 14 L.Ed. 40 (1852)). *See also Hayburn's Case,* 2 U.S. (2 Dall.) 409 (1792); *In re Application of the President's Commission on Organized Crime, Subpoena of Scaduto,* 763 F.2d 1191 (11th Cir.1985). In a narrowly confined exception to the Article III case or controversy requirement, federal judges may engage in non-adjudicatory duties that are ancillary to the administration of justice. *See Sibbach v. Wilson & Co.,* 312 U.S. 1, 9–10, 61 S.Ct. 422, 424–25, 85 L.Ed. 479 (1941) (judges may promulgate procedural rules that aid operation of court); *In re Certain Complaints Under Investigation,* 783 F.2d 1488, 1503–06 (11th Cir.), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986) (judges do not violate Article III by participating on commissions investigating judicial misconduct). However, the Commission's power to formulate guidelines is neither procedural in nature, *see Miller v. Florida,* —— U.S. ——, ——, 107 S.Ct. 2446, 2452–53, 96 L.Ed.2d 351 (1987), nor ancillary to the administration of justice. The guidelines are a binding, formulaic mechanism that has a direct impact on the imposition of a criminal defendant's sentence. In short, the operation of

such a rulemaking body within the judicial branch would unconstitutionally magnify the power of the judiciary.

The Act and attendant guidelines fare no better under "impairment of function" analysis. Impairment occurs when action by one branch has the potential to preclude the affected branch from exercising its constitutionally-designated function; an impairment can be justified "by an overriding need to promote objectives within the constitutional authority of Congress." *Administrator of General Services,* 433 U.S. at 443, 97 S.Ct. at 2790. The impartiality and independence of federal judges are impaired by service on the Commission. The Act removes three jurists from judicial duty for full-time, six to twelve year intervals. 28 U.S.C. Sections 992(a) & (b). Though this removal is not sufficient in itself to void the statute, the judge-Commissioners' extensive involvement with the executive branch is both unparalleled and inappropriate. The President's power to appoint judges to the prestigious panel, 28 U.S.C. 991(a), and his removal power over the appointees, *id.,* "raises the ominous spectre of further politicization of the judiciary." *United States v. Lopez,* 684 F.Supp. 1506, 1512, (C.D.Cal.1988) (en banc). "Thus, the President holds the carrot of appointment and the stick of removal over Article III judges' service on the Commission." *Id.,* at 1512. Also of consequence is the appearance of dependence and partiality that would be fostered in the minds of litigants and the general public if Article III judges interact so extensively with the executive branch. The court concludes that the Act constitutes a significant threat to the operation of the judicial branch.

Though the potential for impairment exists, that obstacle can be overcome if the composition of the Commission results from Congress' "overriding need" to project its constitutional authority. That necessity is not present here. Congress could have achieved its goal of reducing sentencing disparities by ensuring nonmandatory judicial involvement that comported with the strictures of Article III. *Arnold,* 678 F.Supp. at 1472. Granted that judge-Commissioners would uniquely con-

tribute to the formulation of sentencing guidelines and policy; that benefit, however, "do[es] not outweigh the potential for impairment of the function of the judiciary and the loss of its independence." *Estrada*, 680 F.Supp. at 1336.

The court finds the Act and the guidelines violative of separation of powers jurisprudence. In light of this ruling, the court declines to address the defendants' delegation and due process [2] arguments.

### III. *Severability*

■ The Act originated as Chapter II of the Comprehensive Crime Control Act of 1984 ("CCCA"), Pub.L. No. 98–473, 98 Stat. 1837, 1988. In *United States v. Molina*, 688 F.Supp. 819 (D.Conn.1988), Chief Judge Daly of this district also found the guidelines objectionable on separation of powers grounds. Heeding the presumption that severance of the unconstitutional portions of a statute is preferable to voiding the entire act, *see Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S.Ct. 3262, 3269, 82 L.Ed. 2d 487 (1984) (plurality opinion), Judge Daly severed from the CCCA only those components offensive to the Constitution. The court adopts Judge Daly's reasoning and conclusions and finds that the following provisions are unconstitutional and may be severed from the CCCA:

1. 28 U.S.C. Sections 991–998 and the sentencing guidelines promulgated thereunder;

2. 18 U.S.C. Sections 3553(a)(4) and (5), (b), (c)(1) and (2), and the last sentence of paragraph (e), the portions of the CCPA mandating court application of the guidelines; and

3. CCCA, title II, Section 218(a)(5) (*see* 98 Stat. 2027), the repeal of the United States Parole Commission.

In addition, the court shall construe Section 215(b) of the Act as retaining what was once Rule 35(b), Fed.R.Crim.P.

### Conclusion

For the foregoing reasons, the defendants' motions are granted. If adjudged guilty at some future date, the defendants will be sentenced in accordance with the law pre-existing November 1, 1987.

---

2. By way of dictum, the court notes the persuasiveness of due process arguments being addressed, and upheld, in recent guidelines cases. Though the due process argument in the instant matter is limited to the issue of probation, defendants in other cases have argued that their fifth amendment due process rights are violated "by the severe restriction mandated by the guidelines on a district court's ability to assess the circumstances of the case in determining sentence." *United States v. Frank*, 682 F.Supp. 815, 817 (W.D.Pa.1988). The *Frank* court found that the mechanical nature of the guidelines, and the heavy burden a judge faces in departing from the guidelines, severely restricts a judge's ability to individualize a defendant's sentence. *Id.*, at 817–18. The court then found that "a district court's ability to assess the weight of facts at the time of sentencing is deeply etched in our jurisprudence ...." *Id.*, at 818 (citing *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir.1985)). Key to the *Frank* court's holding that the guidelines do violate due process is that a defendant loses the opportunity to contradict facts presented at sentencing and the weight to be accorded those facts: "[D]ue process requires that a defendant be afforded the opportunity to participate in [the] weighing process." *Accord United States v. Lopez*, 684 F.Supp. 1506, 1513 (C.D.Cal.1988) ("rigid, computerized nature of the guidelines ... precludes ... weighing the importance of aggravating and mitigating factors ...."); *United States v. Elliott*, 684 F.Supp. 1535, 1541 (D.Col.1988) ("defendant lacks opportunity to convince sentencing judge that there are circumstances which override [the guideline's] point allocations").