UNITED STATES of America, Plaintiff,

v.

Bruce Allan MYERS, Defendant.

No. CR 87–0902 TEH.

United States District Court,
N.D. California.

April 11, 1988.

Nanci Clarence, San Francisco, Cal., for defendant.

Marla J. Miller, San Francisco, Cal., for U.S.

## ORDER

THELTON E. HENDERSON, District Judge.

This matter comes before the Court on defendant's motion to declare the Sentencing Reform Act unconstitutional or inapplicable to him. Defendant is charged with one count of theft of government property, a violation of Title 18, United States Code, Section 641. Defendant contends that the Sentencing Reform Act violates the non-delegation and separation of powers doctrines of the United States Constitution. He also asserts that the sentencing guidelines promulgated under the Act violate the Act's statutory mandate. After extensive consideration of the parties' papers and oral arguments, including those of Amicus Curiae Sentencing Commission, this Court hereby upholds the guidelines.[1] However,

---

1. To this Court's knowledge, eight district judges have announced decisions on the constitutionality of the guidelines. Four judges have upheld the guidelines and four have struck them down. Three judges have written opinions on the issue. The written opinion cases are *United States of*

the Court finds that one provision of the Act, 28 U.S.C. § 991(a), the removal provision, is unconstitutional. The Court hereby severs that provision from the statute, but otherwise sustains the guidelines' constitutional and statutory validity.

## I. The Sentencing Reform Act of 1984.

On October 12, 1984, President Reagan signed into law the Comprehensive Crime Control Act of 1984, Pub.L. 98–473, 98 Stat. 1976, 2017 ("CCCA"), codified in numerous titles. Chapter II of the CCCA, the Sentencing Reform Act of 1984, 28 U.S.C. §§ 991–998, radically alters the both the procedures used to sentence defendants in federal courts, and the degrees of punishment they will receive.

Prior to the passage of this Act, Congress had conferred vast discretion on district judges to determine appropriate sentencing. Though Congress established a range of sentences, courts were empowered "to consider aggravating and mitigating circumstances surrounding an offense, and, on that basis, to select a sentence with a range defined by the legislature." *United States v. Grayson,* 438 U.S. 41, 46, 98 S.Ct. 2610, 2613, 57 L.Ed.2d 582 (1978). In addition, the Federal Probation Act of 1925, now 18 U.S.C. § 3651, authorized courts to order probation if doing so would serve "the ends of justice and best interests of the public, as well as the defendant." *Burns v. United States,* 287 U.S. 216, 220, 53 S.Ct. 154, 155, 77 L.Ed. 266 (1932). The indeterminacy and lack of congressional control over sentencing was compounded by the Parole Commission, which had the discretion to determine when prisoners had become sufficiently rehabilitated to warrant release. Thus, the pre-Act system was one in which "[i]ndeterminate sentences the ultimate termination of which are sometimes decided by non-judicial agencies have to a large extent taken the place of the old rigidly fixed punishments."

*Williams v. New York,* 337 U.S. 241, 248, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949).

Dissatisfied with the disparities in sentencing that this system engendered, Congress enacted several reforms to limit sentencing discretion. Congress both enacted the parole guidelines promulgated by the Parole Board, 18 U.S.C. §§ 4201–4218, and empowered the Judicial Council to formulate advisory sentence guidelines, 28 U.S.C. § 334(a). However, as the Senate Report accompanying the Act states, Congress concluded that these reforms did not solve the system's perceived flaws. Instead, Congress found that the concepts of indeterminate sentencing and parole release were based on an outdated and inappropriate rehabilitation model. S.Rep. No. 225, 98th Cong., 2nd Sess. 37, 38–40 (1983) (hereafter "S.Rep.") (reprinted in 1984 U.S. Code Cong. & Admin.News 3182). More importantly, Congress noted that "every day Federal judges mete out an unjustifiably wide range of sentences to offenders with similar histories, convicted of similar crimes, committed under similar circumstances." S.Rep. at 38, 1984 U.S.Code Cong. & Admin.News, 3221. Congress traced these disparities to the "unfettered discretion the law confers on those judges and parole authorities responsible for imposing and implementing the sentence." *Id.* at 38, 1984 U.S.Code Cong. & Admin. News 3221. The sentencing disparities, compounded by the "second-guessing" and lack of cooperation between the sentencing judge and the parole board, created a system that "lack[ed] the sureness that criminal justice must provide if it is to be … an effective deterrent against crime." *Id.* at 49–50, 1984 U.S.Code Cong. & Admin.News 3232, 3233.

The Act arises from, and attempts to solve, the problem of disparity. The central feature of the Act is the creation of the Sentencing Commission. The Act establishes the Commission within the judicial branch, 28 U.S.C. § 991(a) (1982 ed., Supp.

*America v. Fernando Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal.1988) (upholding the guidelines); *United States of America v. Chambless et al.,* 680 F.Supp. 793 (E.D.La.1988) (upholding the guidelines) and *United States of*

*America v. Arnold et al.,* 678 F.Supp. 1463 (S.D. Cal.1988) (striking down the guidelines). This division in authority attests to the gravity and complexity of this issue.

III 1985). It consists of seven voting members and two non-voting, *ex officio* members—the Attorney General and the chairman of the Parole Commission. The President appoints the members, with advice and consent of the Senate for six year terms. At least three of the members "shall be Federal judges selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States." *Id.* The President may remove members of the Commission for "neglect of duty or malfeasance in office or for other good cause shown." *Id.*

The Commission is charged with the task of promulgating "guidelines ... for [the] use of a sentencing court in determining the sentence to be imposed in a criminal case ..." 28 U.S.C. § 994(a)(1). The guidelines are intended to carve out a defined range of sentences, and curtail "the previously broad sentencing discretion of federal judges." *United States v. Ruiz–Villanueva, supra* at 1413.

Congress required the Commission to adhere to two distinct sets of legislative purposes. First, the Commission must base the guidelines on four traditional rationales for punishment: just punishment, deterrence, incapacitation, and rehabilitation. 28 U.S.C. § 991(b)(1)(A). Second, the Commission must ensure that the guidelines create sentencing certainty and fairness, and eliminate unjustified disparities in sentencing. 28 U.S.C. § 999(b)(1)(B).

In addition to establishing "these overarching purposes and policies, Congress also identified many of the specific factors to be considered in constructing the Guidelines." *Ruiz–Villanueva* at 1413. The Commission was directed to establish categories of offenses based on the grade of the offense, its mitigating or aggravating circumstance, the nature and degree of its harm, the community's view of the offense and the public concern generated by it, the deterrent effect of a particular sentence on the offense, and the current incidence of the offense in the community and the nation. 28 U.S.C. § 994(c). Similary, Congress directed the Commission to establish categories of offenders based on the offender's age, education, vocational skills and employment record, mental and physical condition, family and community ties, role performed in the offense, criminal history, and degree of dependence upon crime. 28 U.S.C. § 994(d). In addition, Congress provided more detailed guidance in latter subsections. Congress instructed the Commission to provide stiff sentences for 1) violent offenses, 28 U.S.C. § 994(h); 2) drug-related offenses, *Id.;* and 3) recidivists, 28 U.S.C. § 994(i), but avoid inappropriately heavy sentences for first-time offenders who have not committed violent crimes. 28 U.S.C. § 994(j). As Judge Enright notes in *Ruiz–Villanueva,* this combination of general and specific legislative instruction "provided the Commission with the makings of a blueprint for the Guidelines." *Ruiz–Villanueva* at 1414.

On April 13, 1987, the Commission completed its work and sent the guidelines to Congress. The Commission grouped offenses into 43 separate categories and offenders into six categories. The Commission then plotted a matrix of coordinates for offenses and offenders, producing a detailed grid of sentences. United States Sentencing Commission Guidelines Manual ("guidelines") at 5.2. The Commission estimated that these guidelines would apply to ninety percent of federal criminal cases. *Ruiz–Villanueva* at 1415. Since Congress took no action within six months after receiving the guidelines and an accompanying report, the guidelines became effective on November 1, 1987, Pub.L. 98–473, § 235(a)(1)(B)(ii), *reprinted at* 18 U.S.C. § 3551.[2] As a result, federal judges must now apply the sentence prescribed by the

---

**2.** Defendant argues that the effective date of the guidelines should be December 18, 1987; that starting date would make the guidelines inapplicable to him, since his offense was committed before that date. Defendant bases this contention on the fact that the Commission submitted a supplemental report to Congress on June 18, 1987. He claims that the submission of the supplemental report triggered the six month period under 18 U.S.C. § 3551. This argument is clearly erroneous, since the Commission submitted the initial report required under the statute in April of 1987. The supplemental report merely expanded upon the initial report.

guideline, unless the judge finds that a particular case involves an aggravating or mitigating circumstance that was not adequately considered by the Commission. 18 U.S.C. § 3553(b). The Commission anticipates these departures will be rare, because the "guidelines, offense by offense, seek to take account of those factors that the Commission's sentencing data indicate make a significant difference in sentencing at the present time." Guidelines at 1.7.

## II. Ripeness.

■ Before turning to the merits of defendant's constitutional and statutory challenge, the Court must first determine whether defendant's challenge is ripe. The government argues that since defendant has not been convicted and may never be convicted of any crime, his challenge is not ripe for adjudication.

In *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed. 2d 681 (1967), the Supreme Court established a test to govern ripeness determinations. The Court instructed lower courts to consider the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."

The government does not dispute that the validity of the sentencing guidelines is "fit" for adjudication. The constitutionality of the guidelines is a pure, abstract legal issue; no specific, particularized facts need to be presented for the Court to decide the issues posed.

The government does dispute that postponing adjudication would harm the defendant. Defendant asserts that he will suffer hardship if the decision is postponed, since he will not be able to make fully informed decisions about whether to offer a guilty plea, or waive a jury trial if he does not plead guilty.

As noted, the guidelines create a quasi-mandatory sentencing regime. That regime will abolish the possibility of probation for the offense for which defendant is charged. Therefore, if the guidelines are constitutional and applicable to defendant, he will be required to serve time in prison if he pleads guilty. Alternatively, if the

guidelines are not constitutional or applicable, defendant might receive probation for his guilty plea. Since a defendant may not waive his right to trial and plead guilty unless he has "sufficient awareness of the relevant circumstances and likely consequences" of a plea, *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970), defendant is entitled to know the likely consequences of a guilty plea before he decides to plead.

In response to this argument, the government first states that the guidelines are not mandatory. While it is true that the Court may on occasion depart from the guidelines, the Court may only do so if it identifies "an aggravating or mitigating circumstance ... that was not considered by the sentencing commission." 18 U.S.C. § 3553(b). Since the Court cannot predict whether this case will present such circumstances, the Court cautiously assumes that it will not depart from the otherwise mandatory guidelines.

The government also argues that under Federal Rule of Criminal Procedure 11, a defendant need only be informed of a maximum sentence. However, Rule 11(c)(1) expressly states that a court must instruct a defendant of "the mandatory *minimum* penalty provided by law before accepting a plea," (emphasis added). Therefore, this argument is also unavailing.

Since the Court is persuaded that defendant's need to make an informed plea decision alone makes this case ripe for adjudication, the Court will not consider defendant's second argument in favor of ripeness. Instead, the Court will turn to the merits of this dispute.

## III. Delegation Issues.

■ The Court will first examine defendant's improper delegation argument. Defendant contends that Congress may not delegate the authority to establish a range of criminal sentences to a commission which resides outside of the legislative branch. Alternatively, defendant argues that even if Congress may delegate this authority, it has failed to provide sufficient

guidance to limit the Commission's discretion. We consider each in turn.

### 1. *Per Se* Non–Delegability.

Defendant avers that the Constitution has assigned particular "core functions" to the legislative branch which may not be delegated to any agency outside that branch. In defendant's view, establishing sentencing guidelines is such a core function.

This argument may be quickly rejected. In *Synar v. United States*, 626 F.Supp. 1374, 1385 (D.D.C. 1986), *aff'd Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), the court explicitly rejected the argument that *any* legislative function is *per se* nondelegable. That three judge panel noted that the plaintiffs had failed to identify any case in which a particular legislative power was held to be *per se* nondelegable. The court noted that in *Lichter v. United States*, 334 U.S. 742, 778–779, 68 S.Ct. 1294, 1313, 92 L.Ed. 1694 (1948), the Supreme Court held that "[a] constitutional power implies a power of delegation of authority under it sufficient to effect its purposes." 626 F.Supp. at 1385. More importantly, the court correctly stated that a " 'core functions' analysis would be effectively standardless," since the line between core and non-core functions "would necessarily have to be drawn on the basis of the court's own perceptions of the relative importance of various legislative functions." 626 F.Supp. at 1385.

We are similarly unwilling to chart such an unsteady course; we therefore reject defendant's core function analysis. Moreover, we agree with Judge Enright in *Ruiz–Villanueva* that even if there are nondelegable core functions, sentencing should not be numbered among them. Given the long history of both judicial and executive involvement in sentencing, and the fact that judges now possess nearly unfettered discretion in imposing sentences, it is "impossible ... to conclude that sentencing is strictly a legislative 'core function' ". *Id.* at 1417.

### 2. Failure to Provide Sufficient Guidance.

■ Defendant next argues that even if Congress may delegate this function, it has failed to provide sufficient guidance to channel and limit the Commission's exercise of discretion. Defendant claims that Congress has failed to make the substantive, value-laden choices inherent in deciding the ranges of criminal sentences. By congressional default, the Commission was empowered to make these policy choices. Defendant concedes that Congress has listed numerous factors for the Commission to consider as it develops its guidelines, but argues that the factors are vague and subjective. In addition, since Congress did not instruct the Commission on the relative importance of the many enunciated factors, the Commission could choose among them as it wished. As a result, the Commission made numerous policy judgments. For example, the Commission increased the penalties for certain white collar crimes, based on its belief that such crimes are relatively underpunished. Guidelines at 2.31. Similarly, the Commission substantially reduced the availability of probation as an alternative to imprisonment, guidelines at 1.8, and increased the use of mandatory supervisory release and mandatory fines. Guidelines at §§ 5D3.1, 5E4.2.[3]

Before determining whether Congress has indeed vested excessive legislative authority in the Commission, we first note that nondelegation arguments suffer from a serious flaw: with two exceptions, they have always been rejected. The Supreme Court has upheld delegation challenges in

---

3. According to defendant, the Commission was also apparently granted the authorization to impose the death penalty for federal crimes that may not presently be punishable by death. Though the Commission decided not to impose the death penalty, fearing that a death penalty provision would threaten congressional enactment of the guidelines, it believed it had the jurisdiction to do so. However, numerous congressional supporters of the Sentencing Reform Act did not believe that Congress had bestowed this authority on the Commission. *See National Law Journal,* March 23, 1987, at 5. Therefore, the Court must disregard this potentially troubling grant of authority to the Commission.

two cases, *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). In both cases, the Court invalidated portions of the National Industrial Recovery Act of 1983. As Judge Brewster noted in *United States of America v. Arnold*, 678 F.Supp. 1463 (S.D. Cal.1988), "[b]oth cases were decided during a period of unusual conflict between the Court and the Roosevelt-dominated Congress." *Arnold* at 1467. Despite impassioned pleas to revive the doctrine,[4] it has remained moribund since then. The Supreme Court has refused to strike down numerous federal statutes that delegate extensive rulemaking power to federal agencies, acting upon the recognition that "[i]n an increasingly complex society Congress obviously could not perform all its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support the defined legislative policy." *Opp. Cotton Mills, Inc. v. Administrator of Wage and Hour Division*, 312 U.S. 126, 145, 61 S.Ct. 524, 533, 85 L.Ed. 624 (1941). Thus, the court sustained the delegation to a World War II Price Administrator to fix prices for commodities which "in his judgment will be generally fair and equitable." *Yakus v. United States* 321 U.S. 414, 420–421, 64 S.Ct. 660, 665, 88 L.Ed. 834 (1944). Similarly, the court upheld allowing the Federal Communication Commission to license radio stations as "public interest, convenience or necessity requires." *National Broadcasting Co. v. United States*, 319 U.S. 190, 225–226, 63 S.Ct. 997, 1013–14, 87 L.Ed. 1344 (1943). Perhaps more analogously, the court sustained the delegation to the Parole Commission to promulgate guidelines regulating parole. *Geraghty v. United States Parole Commission*, 719 F.2d 1199, 1212–1213 (3rd Cir.1983), *cert. den'd* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984). Since these delegations are constitutional,

it is difficult to discern what vitality remains in the nondelegation doctrine.

Nevertheless, the doctrine has never been officially repudiated. The test for delegation has been restated in *National Cable Television Ass'n v. United States*, 415 U.S. 336, 342, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974), in which cable television companies challenged fees imposed upon them by the Federal Communications Commission: "[i]f Congress shall lay down by legislative act an intelligible principle to which the person authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power."

■ We agree with all of the judges who have ruled on this challenge and either explicitly or implicitly rejected defendant's delegation argument: Congress did enunciate intelligible principles to guide the Commission's discretion. Congress directed the Commission to reduce disparities in sentencing, 28 U.S.C. § 991(b)(1)(B), and stated the four purposes that sentencing should serve. 18 U.S.C. § 3553(a)(2), 28 U.S.C. § 991(b)(1)(B). In addition, Congress provided an extensive list of the factors to be used in establishing offense and offender categories. 28 U.S.C. § 994(c) and (d). That guidance is buttressed by a lengthy Senate Report accompanying the legislation, which spells out in detail the goals that Congress intended to achieve. Senate Report at 37–190. To be sure, the congressionally enunciated policies, such as deterrence, sentencing fairness, and certainty, are vague and open-ended. They do allow the Commission to make some important policy determinations. However, the doctrine of nondelegation does not require Congress to delegate the least possible amount of authority. Therefore, the Court rejects the nondelegation challenge.

*IV. Separation of Powers Issues.*

Defendant next argues that the placement of Article III judges in a Commission

---

4. *See, e.g.,* T. Lowi, *The End of Liberalism,* 289–304 (1969); *American Textiles Mfrs. Inst. v. Donovan,* 452 U.S. 490, 543–548, 101 S.Ct. 2478, 2507–10, 69 L.Ed.2d 185 (Rehnquist, J., dissenting); Schoenbrod, *The Delegation Doctrine: Could the Court Give it Substance?,* 83 Mich.L. Rev. 1223 (1984).

with the authority to promulgate broad policy-based guidelines violates the separation of powers doctrine. Defendant contends that the assignment of the Commission to the judicial branch, and its mandated Article III judge membership, impermissibly expands and impairs the judicial function. Surprisingly, the government agrees with defendant that the Commission may not be placed within the judicial branch, though it argues that judges could serve on the Commission if it is reassigned to the executive branch. Only the Amicus Curiae Sentencing Commission ("Amicus") defends the constitutionality of the Commission as created by Congress.

### 1. Impermissible Expansion of Judicial Power.

 Defendant argues that this Commission, composed of three active Article III judges, may not validly enact sentencing guidelines. Defendant vigorously asserts that the Commission conducts substantive rule-making; this function is assertedly inconsistent with the judicial role of deciding cases and controversies as prescribed by Article III. Therefore, the legislative scheme violates the separation of powers doctrine.

Before turning directly to defendant's argument, we note that there are no cases adjudicating the constitutionality of a Commission with similar powers, functions, and members. This Commission is a rather unusual hybrid of legislative, executive, and judicial power, and it does not comfortably fit within traditional notions of governmental power allocation. The Court also acknowledges that cases interpreting Article III's limitations on extra-judicial activities do not form a coherent message on the meaning of Article III. Instead, different courts in different historical eras have displayed fundamentally competing views of the separation of powers. The dichotomy may be characterized as a dispute between a "pragmatic" and "neoclassical" view. *See* Miller, *Independent Agencies*, 1986 Supreme Court Review 41, 52–56.

The pragmatic view "tends to view the separation of powers as a practical approach to government, such that the division of powers between the branches, and the system of checks and balances by which those powers are related to one another, can stand considerable stretching in order to accomodate the changing needs of a modern society." *Id.* at 52. In contrast, the neoclassical view "de-emphasizes the importance of convenience and efficiency ... and emphasizes instead the 'constitutional design for the separation of powers' and the 'structure of the articles delegating and separating power under Acts I, II, and III.'" *Id.* at 53–54, citing *I.N.S. v. Chadha*, 462 U.S. 919, 946, 103 S.Ct. 2764, 2781, 77 L.Ed.2d 317 (1983). The history of Article III's limitations on judicial power may be properly viewed as a continuum of cases which attempt to reconcile these competing views.

Article III states that "[t]he judicial Power shall extend to all Cases ... [and] Controversies." Early cases construing the case or controversy limitation struck down several congressional statutes which expanded the judicial power beyond adjudicating cases. For example, in *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 409, 1 L.Ed. 436 (1792), the court invalidated a statute authorizing district judges to place individuals on a pension list for revolutionary war veterans. The Court noted that this statute empowered judges to perform an administrative function, and affirmed the lower court's conclusion that "neither the legislative nor the executive branches ... can constitutionally assign to the judicial [branch] any duties, but such are properly judicial, and to be performed in a judicial manner."

Since *Hayburn's Case*, the court has invalidated several statutes granting extra-judicial duties to the courts. In *United States v. Ferreira*, 54 U.S. (13 How.) 43, 53–54, 14 L.Ed. 40 (1851), the court cited *Hayburn* for the proposition that Congress could not authorize the district court to adjudicate injury claims subject to Department of Treasury Review. In *Muskrat v. United States*, 219 U.S. 346, 360–362, 31 S.Ct. 250, 255–56, 55 L.Ed. 246 (1911), the court invalidated a grant of authority to the Supreme Court to determine the validi-

ty of the allocation of land allotments. In *Keller v. Potomac Elec. Co.*, 261 U.S. 428, 444–445, 43 S.Ct. 445, 449, 67 L.Ed. 731 (1923), the court struck down legislation allowing the Supreme Court to hear appeals of rate proceedings conducted by the District of Columbia's Public Utility Commission.

A recently decided case by the D.C. Court of Appeals confirms that a strict view of Article III's limitation retains vitality. In *In Re Sealed Case*, 838 F.2d 476 (D.C.Cir.1988), the court invalidated the judicial appointment of special prosecutors pursuant to the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591–598 (1982 & Supp III). That Act, passed in the aftermath of the Watergate crisis, established an Independent Counsel Division of the District of Columbia Court of Appeals. (Special Court). At 481. Under the statute, if the United States Attorney General determines that an investigation of executive officials is warranted, the Special Court is empowered to 1) appoint a special prosecutor independent of the executive branch to investigate and prosecute that official's wrongdoing; 2) determine the scope of that investigation; and 3) terminate the investigation when it is substantially completed. At 512. Three former government officers, all the targets of independent counsels' investigations, challenged the Act, contending, *inter alia*, that the vesting of this power in the Special Court impermissably expands the judicial function. *Id.* at 511.

In striking down the Act, the court noted that the Act vested substantial supervisory power with the Special Court. For example, the Court heard several petitions from the independent counsels to enlarge the scope of their investigation. *Id.* at 513. An independent counsel visited a member of the Court for advice on federal conflict of interest laws. *Id.* at 514. In another case, the Court instructed the counsel to delay an investigation. *Id.* at 514. Finally, the Court had the power to terminate investigations, and remove special prosecutors. *Id.* at 514. Since "these provisions necessarily involve the Special Court in the non-Article III task of supervising the day-to-

day activities of an Executive Branch official," *Id.* at 512, the court held that the Act impermissibly expanded the judicial function and violated the separation of powers doctrine.

These cases would instruct this Court to strictly apply the separation of powers doctrine to this case, and look suspiciously upon the creation of a Commission of judges empowered to conduct rulemaking. However, there are a number of cases that have permitted judges to engage in tasks far afield from deciding cases. Most on point is *Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). In *Sibbach*, the court upheld the power of Congress to delegate to the judiciary the task of promulgating the Federal Rules of Civil Procedure. The court stated that "Congress has undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to this or other federal courts authority to make rules not inconsistent with the statute or the Constitution of the United States." *Id.* at 9–10, 61 S.Ct. at 424. The Supreme Court then stated that the validity of judge-made rules hinges upon "whether a rule really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering the remedy and redress for disregard or infraction of them." *Id.* at 14, 61 S.Ct. at 426. Applying that test to the federal rules challenged by the plaintiff, the court found that this delegation of broad rule making authority was constitutional.

That same flexibility in permitting judges to perform non-Article III tasks is echoed in *Matter of Certain Complaints Under Investigation*, 783 F.2d 1488 (11th Cir.1986), *cert. den'd* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). In that case, the plaintiff, a federal district court judge, challenged a statute creating commissions within the judicial branch to investigate allegations of wrongdoing by judges. Plaintiff argued that the powers conferred on the commission, such as the issuing of subpoenas, were executive functions that the judiciary could not constitutionally per-

form. In analyzing the constitutional challenge, the court eschewed determining the commission's validity on the basis of its function. The court stated "whether investigatory chores, such as issuance of a subpeona, belong in the judicial branch does not turn on a simple description of job characteristics." *Id.* at 1505. Instead, the court focused on the purpose of the commission: "[t]he critical point is that the investigatory tasks at issue here, including the subpeona power, have the sole purpose of exploring complaints against ... judges ... with the ultimate aim of promoting the 'effective and expeditious administration of the business of the courts.' " *Id.* Under this flexible, teleological view, the court upheld the constitutionality of authorizing the judicial branch to conduct investigations, despite the fact that investigatory work is not an adjudicative function.[5]

Finally, the pragmatic view finds support in the long history of federal judges serving on nonjudicial commissions. As succinctly summarized by the court in *Matter of President's Com'n on Organized Crime*, 783 F.2d 370, 376–378 (3rd Cir. 1986), John Jay served simultaneously as Chief Justice of the Supreme Court and Ambassador to England. Chief Justice Marshall accepted an appointment as Secretary of State while sitting on the court. Five Supreme Court Justices served on an Election Commission to resolve a contested election dispute. More recently, Justice Roberts accepted an appointment on a commission to investigate the bombing of Pearl Harbor, Justice Jackson acted as a prosecutor at the Nuremberg war crimes trial, and Chief Justice Warren headed the presidential commission on the assassination of President Kennedy. While these examples of extra-judicial service have never been litigated, and have been criticized, *see* Comment, *Separation of Powers and Judicial Service on Presidential Commissions*, 53 U.Chi.L.Rev. 993, 998 n. 24 (1986), this historical practice does suggest that judges may permissibly do more than decide cases. Moreover, while the "incompatibility clause" of the United States Constitution expressly forbids any "[p]erson holding office under the United States" from being a member of Congress, U.S. Const. Art. I, § 6, the founders did not enact such a clause for members of the judiciary, even though one was proposed. *See* Slonin, *Extrajudicial Activities and the Principle of Separation of Powers*, 49 Conn. B.J. 391, 401 (1975).

■ This line of cases and historical practice instruct this Court not to insist that this statute fall within rigid notions of the proper allocation of power. Instead, under the pragmatic view of the separation of powers, the Court's task is to closely examine the legislative purpose and effect of the Act, and to uphold it if it does not prevent another branch from accomplishing its constitutionally assigned functions" and if "its potential for disruption is ... is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. Administration of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977).

The pragmatic approach best fits the facts of this case.[6] As will be demonstrat-

---

5. The most recent expression of this pragmatic view is found in Judge Ruth Bader Ginsburg's dissent in *In Re Sealed Case, supra.* In rejecting the majority's conclusion that the Ethics in Government Act impermissibly expands the judicial function, Judge Ginsburg noted the "irony in the majority's holding that the Act is constitutionally infirm, for the measure strives to maintain the structural design that is the genius of our Constitution—the system of mutual checks and balances; the Act's sole purpose is to curb or avert abuses of executive branch power." Dissent 838 F.2d at 518. Applying a flexible view of the separation of powers, Judge Ginsburg narrowly construed Congress' grant of authority to the Special Court and concluded that

the Special Court's administrative role did not violate Article III. *Id.* at 524–28.

6. The Court acknowledges that recent decisions of the Supreme Court display the "neoclassical" approach. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), preventing Congress from vesting Federal Elections Commission with prosecutorial power; *I.N.S. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), striking down Congress' use of the "legislative veto"; and *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), invalidating the Gramm–Rudman Act. With the exception of one issue decided in *Bowsher,* the

ed, defendant has failed to identify any palpable harm from judicial rulemaking and service on this Commission. *See infra* at 1415–16. Thus, the underlying purpose of the separation of powers—guarding against governmental tyranny—is not well-served by a strict and technical application of Article III to this case. In addition, we note our agreement with amicus that there was substantial wisdom in Congress' decision to place Article III judges on the Commission, and to locate the Commission within the judicial branch. Given the long history of judicial involvement in sentencing criminals, it was wise for Congress to elicit the participation of federal judges by placing them on the Commission. Moreover, it was prudent for Congress to locate the Commission within the judicial branch, and not the executive branch, to avoid its institutional affiliation with prosecutorial interests. As Congress states, "[p]lacement of the Commission in the judicial branch is based upon the Committee's strong feeling that, even under this legislation, sentencing should remain primarily a judicial function." S.Rep. at 159, 1984 U.S.Code Cong. & Admin.News 3342. While the fact that a statutorily mandated arrangement is "efficient, convenient and useful ... will not save it if it is contrary to the Constitution," *I.N.S. v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983), the compelling purposes served by this Act are relevant factors in the constitutional analysis.

Applying both the pragmatic approach and deference to Congress as required by *Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981), the Court holds that this Act does not violate the separation of powers. We first note a critical fact: federal judges presently have nearly unfettered discretion in sentencing criminals. Sentencing is therefore a judicial function, and one in which Congress has delegated an unusually large amount of its power to the judiciary. Moreover, in imposing individual sentences, judges make exactly the type of substantive, value-laden choices that the defendant claims have been erroneously assigned to the Commission. The fact that judges exercise the discretion to impose substantive value choices at an individual level puts into bold relief the function of the sentencing guidelines. Their purpose and effect is to rationalize the exercise of that discretion upon individual defendants and eliminate a "shameful disparity" of sentences by guiding judges in their sentencing function. S.Rep. at 65, 1984 U.S.Code Cong. & Admin.News 3248. The Act does not authorize the Commission to define new crimes or introduce new penalties. Instead, the Act calls upon the Commission "to synthesize congressionally mandated sentencing policy into a format which would assist judges in imposing fair and uniform sentences." *Ruiz–Villanueva* at 1421.

The promulgation of sentencing guidelines, while not directly analogous to the enactment of the Federal Rules of Civil Procedure, bears sufficient similarity to that task to pass constitutional muster under *Sibbach*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479. To be sure, the determination of prison sentences has a far broader and more significant impact on the public than rules governing processes like permissive joinder and document discovery. Yet the guidelines fundamentally "regulate judicial procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering the remedy and redress for disregard or infraction of them." *Sibbach* at 14, 61 S.Ct. at 426. While the guidelines also regulate the conduct of non-judges; namely, potential and actual criminal defendants, their primary impact falls upon judges who must follow the guidelines in imposing sentences.

This conclusion is not undermined by calling the guidelines "substantive" and

---

parties do not contend that these cases are controlling. *See infra* at 1416. Indeed, all three of these decisions involve congressional usurpation of executive functions; they are therefore not applicable to congressional allocation of power to the judicial branch. However, the

Court notes that the Supreme Court has granted certiorari of *In Re Sealed Case, supra;* that case may provide an opportunity for the court to clarify whether this strict approach applies to separation of powers problems involving the judiciary.

distinguishing them from the "procedural" Rules of Civil Procedure. First, that distinction was enunciated for the purposes of demarcating state and federal rulemaking power, not determining the proper allocation of power within the federal government. *See* Burbank, *The Rules Enabling Act of 1934*, 130 U.Pa.L.Rev. 1015, 1028 (1982).

Even if the distinction were to apply in principle to federal separation of powers problems, it is too elusive to be useful in deciding this case. As Justice Harlan noted in his famous concurrence in *Hanna v. Plumer*, 380 U.S. 460, 475, 85 S.Ct. 1136, 1146, 14 L.Ed.2d 8 (1965), the distinction between procedure and substance founders upon the recognition that "any rule, no matter how clearly 'procedural', can affect the outcome of litigation." Similarly, as Justices Fortas and Douglas stated in *Snyder v. Harris*, 394 U.S. 332, 355, 89 S.Ct. 1053, 1066, 22 L.Ed.2d 319 (1969) (Fortas and Douglas, J.J. dissenting), the rules "occasions on which the subject matter jurisdiction is exercised."

More importantly, even if we were to reject the guidelines analogy to *Sibbach*, we would not necessarily uphold a challenge to judicial rulemaking on the grounds that it has a substantive impact. Judges' individual sentencing decisions also have a generalized substantive impact; judges frequently sentence criminals precisely to deter others from committing crime. Since individual judges' sentencing decisions are substantive, and since the guidelines are intended primarily to rationalize the individual sentences, the fact that the guidelines also have a substantive impact does not in itself render them unconstitutional.

In our view, the proper distinction between valid and invalid judicial rulemaking does not rest upon the talismanic terms of substance and procedure.[7] While we reject

this distinction, we do believe a line must be drawn. This opinion should not, for example, be interpreted as holding that Congress could establish an Anti–Trust Commission composed of Article III judges and empower it to promulgate binding codification of case law interpreting the Sherman and Clayton Antitrust Acts. However, there is an essential difference between the sentencing guidelines and our hypothetical anti-trust commission. It is a legislative function to define the types of conduct that violate the law; it is a judicial function to determine the appropriate penalty, subject to statutory boundaries. Thus, for the Sentencing Commission to be analogous to the antitrust commission, Congress would have had to grant it the power to define crimes, not merely create a grid of penalties. In our view, this distinction between legislation defining rights or outlawing certain types of conduct and judicial rules rationalizing the remedies or penalties for violation of that legislation rests upon a much surer footing than the substance/procedure distinction. It also more closely identifies the difference between the legislative and judicial function. Drawing the line as we have done, we place the sentencing guidelines on the constitutionally valid side of judicial rulemaking.

2. Impermissible Impairment of the Judicial Function.

■ Defendant next argues that participation of federal judges in the Commission impairs the judiciary. The applicable test for impairment calls upon courts to determine the "extent to which [a statute] prevents [another] branch from accomplishing its constitutionally assigned functions." If so, the Court must decide whether the disruptive effect "is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon, supra*, 433 U.S. at 443, 97 S.Ct. at 2790.

7. The Court's conclusion is not undermined by defendant's citation of *Miller v. Florida*, —— U.S. ——, 107 S.Ct. 2446, 2453, 96 L.Ed.2d 351 (1984). In *Miller*, the Supreme Court held that Florida could not retroactively impose an amended sentencing guideline on a defendant, since the guideline was a substantive, and not merely procedural change in Florida's criminal

law. Because this Court's determination of the Act's constitutional validity does not rest upon the substance/procedure distinction, *Miller* is not applicable. Moreover, we do not interpret that opinion on the ex post facto clause as an oblique comment on the propriety of judicial rulemaking.

Defendant first argues that the judges' participation on the Commission will bias them by requiring them to adopt a pro-prosecution stance. Defendant relies heavily on *Application of President's Commission on Organized Crime v. Scaduto*, 763 F.2d 1191, 1197 (11th Cir.1985), in which the court held that judicial membership on an advisory presidential commission on organized crime impairs the judiciary. In *Scaduto*, the court held that "[a] judge who is charged with assisting and improving enforcement efforts against organized crime must adopt a pro-government perspective which is ill-suited to his obligation to be neutral in the courtroom." *But see In Re President's Commission on Organized Crime*, 783 F.2d 370 (3d. Cir.1986), holding that judicial membership on that same commission is permissible.

Whether the eleventh or the third circuit's view on this question is correct, the instant case is distinguishable. The Commission is a different entity with a different purpose. The Sentencing Commission has not been authorized to assist the president in the fight against crime; instead, its purpose is a far more neutral one of rationalizing federal sentencing. Thus, membership on the commission does not require the judge/commissioners to adopt a pro-prosecution stance; the commissioners must instead commit themselves to promulgating fair and adequate guidelines. Moreover, to the extent that any of the three judges are biased in cases involving challenges to the guidelines, they can easily recuse themselves from those cases.

■ In addition, we cannot join the conclusion of Judge Brewster in *Arnold, supra*, that judicial service on the Commission harms the judiciary in other significant ways. To be sure, the judges serving on the Commission cannot devote their time to deciding a full load of cases. However, the loss of three judges is minimal to a judiciary consisting of nearly eight hundred judges. Moreover, though the Act does "create[ ] a permanent working relationship between the Judiciary and the Executive ...", *Arnold* at 1472, we do not believe that this constitutes "an excessive intermingling of [the] two branches" which "erodes the appearance of impartiality of the judicial branch." *Arnold* at 1472. We are convinced that judges will remain able to fairly and impartially rule upon cases challenging the guidelines, despite the fact that three judges have assisted in creating the guidelines. Indeed, federal judges frequently are required to rule upon the opinions drafted by their colleagues. In many of those instances, judges are required to fill in the interstices of vague federal statutes, thereby creating substantive policy. Other judges in other circuits must then pass upon their work; it is beyond contention that these other judges can do so fairly and impartially.

■ Nor does the Court believe that judicial service on the Commission will create a widespread perception of non-impartiality. As already noted, there has been an extensive historical record of judicial service on commissions. In addition, unlike *Scaduto*, the task of constructing the guidelines does not require affiliation with or commitment to a particular view of criminal justice. Therefore, we believe that practitioners and members of the public will not view three judges' service as evidence of a biased judiciary. Accordingly, we reject defendant's claim that the Act impairs the judiciary.[8]

### 3. Presidential Removal Power.

■ However, there is one intractable flaw with the Commission as presently constituted: the President has the power to remove the Commission's members for good cause. 28 U.S.C. § 991(a). Unlike defendant's other separation of powers ar-

---

8. Similarly, the fact that Article III judges serve on the Commission with non-judges does not impair the judicial function, or demonstrate that the Commission cannot properly be constituted as a judicial branch entity. Under *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), Article III judicial power must be exercised by Article III judges. However, the work of the Commission does not involve deciding cases or controversies; therefore Article III's lifetime tenure and undiminishable salary requirements do not apply to the Commission.

guments, this objection is girded to a recently decided Supreme Court case that is directly on point, *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). In *Bowsher*, the Supreme Court invalidated the Balanced Budget and Emergency Deficit Control Act of 1985, popularly known as the Gramm–Rudman Act. Under Gramm–Rudman, Congress established maximum deficit amounts for federal spending in successive years. If the deficit for any year exceeds the targeted amount, the Act mandates across-the-board spending cuts to reach the targeted level. The official in charge of ordering these reductions is the Comptroller–General, who is appointed by the President but removable by Congress for "disability, inefficiency, neglect of duty, malfeasance, or [commission of] a felony ..." 31 U.S.C. § 703(e)(1).

In striking down the Act, the court first held that the Comptroller–General performed executive functions under the Act, since his job was to "exercise judgment concerning facts that affect the application of the Act" and "interpret the provisions of the Act to determine precisely what budgetary calculations are required." 106 S.Ct. at 3192. Since the Comptroller–General was performing an executive function, Congress could not constitutionally exercise the power to remove him from office. The court explained that "[t]o permit an officer controlled by Congress to execute the laws would be, in essence, to permit a congressional veto. Congress could simply remove ... an officer for executing the laws in any fashion found to be unsatisfactory to Congress." *Id.* at 3189.

The analogy to this case is clear. Here, the President has the authority to remove officers who are performing the judicial function of promulgating sentencing guidelines. Moreover, as defendant argues, the President has even more control over the

Commission members than Congress had over the Comptroller–General. To remove the Comptroller–General, both Houses of Congress would have to pass a resolution and obtain the President's assent, or vote by a two-thirds majority to remove the Comptroller–General. In contrast, the President alone may remove a commissioner. Moreover, the standard for removal in *Bowsher* is nearly identical to the standard under this statute. Like *Bowsher*, the Act permits the President to remove commissioners "for neglect of duty or malfeasance in office or for other good cause." 28 U.S.C. § 991(a). In addition, while the Comptroller–General serves a single fifteen year term without the possibility of reappointment, the commissioners serve only six year terms and may be re-appointed by the President, thus giving the President additional leverage over the commissioners.

Finally, we must reject amicus' argument that *Bowsher* is inapplicable since the Commission does not perform an exclusively judicial function inconsistent with executive removal power. The court's invalidation of the Gramm–Rudman Act did not hinge upon a finding that the Comptroller performed exclusively executive functions; indeed, as the lower court noted in *Synar v. United States*, 626 F.Supp. 1374, 1399–1400 and n. 29, the primary role of the Comptroller is to serve as a legislative aid. Thus, amicus' argument does not save the removal provision. We find that *Bowsher* controls this case, and compels the conclusion that presidential removal power over members of a judicial commission is unconstitutional.[9]

4. Severability.

In conformity with this Court's pragmatic approach to the separation of powers, we do not find that the removal provision requires invalidation of the Act and the guidelines. Instead, as the Su-

**9.** Contrary to Amicus' assertion, *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) does not save the removal provision. In *Humphrey's Executor*, the court upheld the power of Congress to limit the grounds for which the President could remove officers of "independent" agencies that perform legislative and adjudicative tasks. However, *Humphrey's Executor* did not validate allowing one branch of government to have the power to *remove* officers of another branch. *Bowsher* does address that question, and holds that such inter-branch removal power is impermissible.

preme Court has counseled in *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987), we sever the removal provision from the statute, keeping intact the remainder of the statute and the guidelines themselves.

In *Alaska Airlines*, the court reviewed a challenge by airline companies to a Department of Labor ("DOL") Regulation promulgated pursuant to the Airline Deregulation Act of 1978. That Act contained a "legislative veto" provision, allowing one House of Congress to veto regulations issued by the DOL. In *I.N.S. v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the court invalidated a similar legislative veto provision, and the parties agreed that *Chadha* invalidated the veto provision in this case. Thus, the court granted certiorari "to consider whether [the] legislative veto provision is severable from the remainder of the Act." 107 S.Ct. at 1478. In determining that issue, the court first enuciated the principle that "[a] court should refrain from invalidating more of the statute than is necessary" and that it is the duty of the court to separate constitutional and unconstitutional provisions and " 'maintain the act in so far as it is valid,' " *Id.* at 1480, quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). The standard for severability is predicated upon this deference to Congress: "the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted." 107 S.Ct. at 1481.

In finding that the veto provision was severable, the court noted that the "balance of the legislation" is capable of "functioning independently," since the veto provision "by its very nature is separate from the operation of the substantive provision of [the] statute." *Id.* at 1480. Moreover, "when Congress enacted the legislative-veto provisions, itcontemplated that activity under the legislation would take place so long as Congress *refrained* from exercising that power." *Id.*, emphasis in original. Finally, the court noted that Congress had provided substantial guidance to the DOL to issue the rules in question, and had enacted a fallback mechanism for express-

ing its disapproval of DOL's rules, since the rules would not be effective until Congress had the opportunity to review them. *Id.* at 1482–1483.

All of these considerations are applicable here. First, the removal provision functions independently from the substantive provisions of the statute. Second, Congress clearly contemplated that the activity of the Commission—promulgating the guidelines—would occur so long as the President refrained from removing any of the members. Third, Congress provided substantial guidance to ensure that the legislative mandate was fulfilled. *See* discussion of delegation, *infra* at 1410–11. Finally, Congress enacted a mechanism for ensuring that the Commission obeyed the mandate. The Act requires that the Commission submit the guidelines to Congress; Congress then has six months to review them, enact amendments, or entirely reject them. 18 U.S.C. § 3551. Given the extensive guidance and control retained by Congress under the Act, it is highly unlikely that Congress would have considered the presidential removal provision central to the legislative scheme.

This conclusion is buttressed by a reading of the Senate Report. While the report presents a rather detailed explanation of the reasons for the composition of the Commission and its terms of membership, the Report is silent on the policies underlying the removal provision. *See* S.Rep. at 63–64, 159–163. This silence attests to its relative unimportance. The most likely explanation for the insertion of the removal provision is that Congress wished to have a mechanism short of a cumbersome impeachment process to remove members who were not performing their duties. Congress probably vested the removal power in the President since he had the power to appoint the commissioners. However, this objective can be fulfilled without presidential removal power. For example, Congress could amend the Act to allow for the Chairperson of the Judicial Concil to have that power. Since this Court is convinced that a severed statute will "function in a *manner* consistent with the intent of Con-

gress," 107 S.Ct. at 1481, emphasis in original, we sever the unconstitutional provision, but uphold the remainder of the statute.[10]

## V. Modification Power.

■ Defendant's final constitutional objection is also unavailing. Defendant objects to the fact that the Commission may modify the guidelines, pursuant to 28 U.S.C. § 994(s). Under that section, the Commission may consider petitions filed by convicted defendants requesting modification of the guidelines "on the basis of changed circumstances unrelated to the defendant" such as "the community view of the gravity of the offense" and "the deterrent effect" of particular sentences. 28 U.S.C. § 994(s). If the Commission does modify a guideline, that amendment becomes law if Congress does not act within 180 days. 28 U.S.C. § 994(p). Defendant argues that this modification power allows the Commission to perform an adjudicative function. Since the Commission includes non-Article III judges, this modification power assertedly violates Article III's requirement that the judicial function be performed by judges.

This argument misstates the nature of the Commission's modification power. The Commission does not have the power to amend individual sentences. Instead, if the Commission amends a guideline, and the amendment becomes law, the petitioner/defendant would have to appear before his sentencing judge and request that the judge apply the amendment retroactively to him. The decision of whether to reduce the defendant's sentence remains with the sentencing judge's discretion. 18 U.S.C. § 3582(c). Moreover, since the provision prevents the Commission from basing its modification on the defendant's own circumstances, the Commission is precluded from adjudicating that individual defendant's case. Thus, the modification power is not an adjudication of an individual's sentence; that adjudicative power remains vested with the sentencing judge. Instead, the modification power is an extension of the Commission's power to adopt the guidelines. The provision was enacted "to assure that the Commission is constantly alerted to the possible need for amendments to the guidelines." S.Rep. at 179, 1984 U.S.Code Cong. & Admin.News 3362.

## VI. Statutory Challenges.

Defendant also challenges particular provisions of the guidelines, arguing that they are in conflict with congressional intent as expressed in the Act. With the exception of one of those challenges, the Court stays deciding these challenges, since they are not ripe.

We found defendant's constitutional challenge ripe because the guidelines eliminated probation for the offense for which he is charged, and defendant needed to know whether the sentencing guidelines were constitutional before deciding to plead guilty. We also found that since the constitutional issues were purely legal ones which needed no further factual elucidation, the matter was fit for adjudication.

In contrast, defendant's statutory challenges do not display this urgency. Defendant contends that the guidelines improperly expand the prison population, improperly require mandatory supervisory release and the imposition of fines, erroneously base sentences on the length of defendants' prior prison terms, and improperly disallow a judge from rewarding a defendant for cooperation with the prosecution.[11] In making these challenges, how-

---

**10.** While defendant's challenge to the removal provision raises a valid constitutional defect, defendant's "compensation clause" objection does not. Defendant points out that judge/commissioners receive a salary equal to the salary of a circuit judge. Therefore, if a district judge became a commissioner, she would receive an increase in salary, which could then be diminished if she were removed from the Commission or if her term expired. Though this would diminish her salary, her salary *as a judge* would remain protected by Article III's compensation clause.

**11.** The Court will not stay adjudicating defendant's claim that the General Accounting Office's study of the guidelines was defective. Defendant clearly lacks standing to assert this claim, since the victim of that alleged misfeasance is Congress, not the defendant.

ever, defendant does not even allege that he may be a victim of any of these asserted defects. For example, without an allegation that defendant has in fact cooperated with the prosecution, defendant cannot assert that he has been harmed by the guidelines' treatment of cooperation. Moreover, with regard to the prison overcrowding claim, the defendant cannot yet present facts demonstrating that the guidelines have induced prison overcrowding. Indeed, the parties dispute whether the guidelines themselves will cause a significant prison population increase, or whether the new Anti–Drug Abuse Act of 1986, Pub.L. 99–570 will cause prison overcrowding. Thus, the Court has no way of knowing whether it is merely providing an advisory opinion on these issues, or whether they are indeed matters of consequence to the defendant. Therefore, the Court will stay determination of these matters until defendant is convicted or pleads guilty. At that time, defendant is free to raise these issues again, provided that they would affect the sentence he would receive.

One of defendant's statutory arguments is ripe: he contends that the guidelines erroneously reduce the availability of probation. Unlike the other statutory claims, defendant is harmed by the reduction of probation, since the offense he was charged with is a probatable offense under the pre-Act sentencing regime. Therefore, that claim is ripe.

Before turning to the merits of defendant's argument, we first note that Congress had six months to review the guidelines and determine whether they adhered to congressional intent. The guidelines were extensively reviewed by the General Accounting Office, and the GAO's study was presented to Congress. Congress failed to amend the guidelines' treatment of probation; this failure suggests that Congress did not believe that the Commission had erred, and constitutes probative evidence of the Commission's adherence to the statutory mandate.

Defendant raises two objections to the Commission's treatment of probation. First, he contends that since Congress authorized the Commission to "impose a sentence sufficient, but not greater than necessary" to serve the sentencing purposes under 18 U.S.C. § 3553(a), the Commission was required to follow a "least restrictive alternative" to sentencing, and therefore recommend probation for a wide array of crimes and offenders. Clustered with this argument is a claim that Congress intended that probation be granted for crimes in which the "defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense ... 28 U.S.C. § 994(j)."

While we agree with the government that Congress did not enact a least restrictive alternative approach,[12] Congress clearly did contemplate that probation would remain an available sentencing alternative. See S.Rep. at 75, n. 162; 172–175. However, we disagree with defendant that the Commission has erroneously reduced the use of probation. Under the guidelines, probation is available for all of the first six offense levels, since all have a minimum of zero months imprisonment. In addition, probation may be granted for offense levels 7–10, provided that the sentencing judge also impose some additional confinement term, such as evenings or weekends in prison. See Sentencing Guidelines at 5.5. Thus, the guidelines permit a judge to impose probation for relatively minor offenses, particularly when the defendant does not have en extensive criminal record. Moreover, in an appropriate case, the judge retains the authority to depart from the guidelines and order probation for crimes and offenders not probatable under the guidelines. 18 U.S.C. § 3553(b). While the guidelines do appear to sharply decrease the use of probation for many crimes, see GAO, *Sentencing Guidelines: Impact on the Federal Judiciary*, September 1987 at 13, defendant points to no statutory provision which disallows such a decrease. Indeed, since the purpose of the Commission's task is to reduce sentencing dispari-

---

**12.** In fact, as the government notes, the Senate rejected a proposal that judges be required to consider the least restrictive sentencing alternative. See S.Rep. at 78.

ties, it was logical for the Commission to achieve that end by diminishing the discretion to impose probation.

Defendant next argues that the Commission erroneously failed to create a separate set of guidelines governing the decision of *whether* to impose probation or imprisonment. Instead, the Commission lumped these two types of punishment into one sentencing grid. Defendant objects to this conflation, arguing that it is "not possible to reduce the [congressionally mandated] purpose of sentencing ... to a mathematical computation." Defendant's Brief at 52. According to defendant, the Commission was required to establish a separate guideline for probation and thereby permit a judge to depart from the grid of imprisonment terms to impose probation in an appropriate case.

This argument also fails. First, the statute does not expressly require separate guidelines for probation. *See* 28 U.S.C. § 994(a)(1)(A) and (B). Second, the use of probation has not been "reduced to a cipher in the guidelines." Defendant's brief at 49. As noted, the guidelines permit judges to impose probation for relatively minor crimes and depart from the guidelines altogether in an appropriate case. Though the guidelines do reduce the judge's discretion to impose probation, they do not "subsume all of [the goals of punishment] into a formula of numbers." Defendant's brief at 52.

Third, and most importantly, defendant's argument against the use of the grid for determining probation proves too much; the argument cannot be limited to the guidelines' treatment of probation. In many instances, probation is a harsher penalty than a small imprisonment term, particularly if the judge imposes additional coercive conditions on the probation, such as drug testing. Therefore, if a grid cannot be used to determine probation because a grid cannot adequately embody all the goals of sentencing, then other penalties specified by the grid, such as light prison terms, are also invalid. Of course, the Act was designed precisely to create such a grid; Congress made the policy choice that determinate sentencing should replace the present discretionary system which allows for a freer interplay of sentencing goals. Therefore, defendant's argument is, at bottom, an objection to the very enterprise of the Commission itself, an enterprise that Congress resoundingly approved. Therefore, the Court concludes that the Commission did not err in is treatment of probation.

*Conclusion.*

By rejecting defendant's constitutional and statutory arguments, the Court is not affirming that these guidelines create just and fair sentences. Nor is the Court commenting upon the wisdom of rigidifying one of the most important—and importantly discretionary—functions a judge performs. The Court recognizes that these sentencing guidelines are both rigid and harsh, and that they are likely to engender significant dissatisfaction from many participants in the criminal justice system. Instead, the Court is only holding that 1) Congress may constitutionally delegate the authority to promulgate sentencing guidelines to a Commission; 2) judicial membership on the Commission neither impermissably expands or impairs the judicial function; and 3) the guidelines' treatment of probation does not violate the Sentencing Reform Act. Therefore, the Court rejects defendant's constitutional challenge to the guidelines. The constitutionality of the Act as a whole is upheld, though the presidential removal clause in 28 U.S.C. § 991(a) is hereby severed from the remainder of the Act.

IT IS SO ORDERED.